**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

GI DI RUSHMORE PARENT L.P.,

    Plaintiff,

    v.

DONALD E. STOOPS, JR.,

    Defendant.

C.A. No. 2026-0505-JTL

**OPINION DENYING PRELIMINARY INJUNCTION**

Date Submitted: May 22, 2026
Date Decided: June 10, 2026

Travis S. Hunter, Gabriela Z. Monasterio, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Jeremy Ben Merkelson, Patrick T. Wilson, DAVIS WRIGHT TREMAINE LLP, Washington, D.C.; *Attorneys for Plaintiff.*

James D. Taylor, Jr., Allison M. Neff, SAUL EWING LLP, Wilmington, Delaware; John A. Basinger, SAUL EWING LLP, New York, New York; *Attorneys for Defendant.*

**LASTER, V.C.**

GI DI Rushmore Parent L.P. ("Holdco") is a holding company controlled by a private equity firm. Holdco owns 100% of the equity of non-party Clarity Telecom LLC, which does business as Bluepeak.

Donald E. Stoops, Jr. has spent his life living and working in Oklahoma. Bluepeak recruited Stoops to become its Vice President for New Market Activity. Stoops resigned from his former employer and started working at Bluepeak based on a term sheet that contemplated an equity award. Six weeks later, Bluepeak presented Stoops with an Incentive Unit Grant Agreement (the "Unit Agreement"). The terms were non-negotiable. He had two options: sign the Unit Agreement or relinquish the equity that induced him to join Bluepeak. It was a take-it-or-leave-it deal.

The Unit Agreement contains restrictive covenants that would appear customarily in an employment agreement. They include a competition restriction, a personnel-solicitation restriction, a disparagement restriction, and a confidentiality restriction. The covenants applied during Stoops' employment and for two years after.[1]

The Unit Agreement specifies that Delaware law governs its terms. The Unit Agreement does not contain a Delaware forum selection provision, but it incorporates by reference Holdco's limited partnership agreement (the "Partnership Agreement").

---

[1] Holdco insists that the equity award constituted the consideration that supports the covenants, yet the Unit Agreement allows Holdco to cancel the equity award if Stoops violates the covenants, at which point the covenants continue to apply. The Unit Agreement thus sets up a double-downside situation for Stoops in which he can lose the equity that justified the covenants even while the covenants continue to constrain him.

That agreement contains a Delaware forum selection provision (the "Delaware Forum Clause").

Stoops never saw the Partnership Agreement. When presented with the Unit Agreement, Stoops was not given a copy of the Partnership Agreement. Nor was he told where he could find it. No one told him he could request it. He nevertheless asked for it several times and was refused. He did not see the Partnership Agreement until this litigation.

It turns out that Holdco treats the Partnership Agreement as confidential such that only three C-suite executives have seen it. Unlike Stoops, at least one of those C-suite executives had actual bargaining power. He used it to secure an employment agreement that contracted around the Delaware Forum Clause, the Delaware choice-of-law provision, and the standard-form restrictive covenants.

The Incentive Units are a form of incentive compensation. Oklahoma has a significant interest in how businesses operating within its borders compensate Oklahomans. Oklahoma likewise has a significant interest in the extent to which businesses can impose restrictive covenants on Oklahomans. To protect its citizens, Oklahoma has enacted legislation regulating restrictive covenants and restricting the effectiveness of choice-of-law and choice-of-forum provisions.

Stoops resigned from Bluepeak and took a position with a competitor. Relying on the Delaware Forum Clause in the never-before-revealed Partnership Agreement, Holdco sued Stoops in Delaware. Stoops has no ties to Delaware except through the Unit Agreement's incorporation by reference of the never-before-revealed

2

Partnership Agreement and its Delaware Forum Clause. If the Delaware Forum Clause cannot support this court's exercise of personal jurisdiction over Stoops, this action cannot proceed.

Holdco sought a preliminary injunction barring Stoops from working for his new employer pending trial. That application is denied because Holdco has not established a reasonable likelihood that this court can exercise personal jurisdiction over Stoops.

Oklahoma law, not Delaware law, controls the employment-related features of the Unit Agreement. Oklahoma law, not Delaware law, controls the extent to which the Delaware Forum Clause can bind Stoops for purposes of enforcing the employment-related features of the Unit Agreement. Under Oklahoma law, the Delaware Forum Clause is invalid.

Assuming Delaware law applies, the court will not enforce the Delaware Forum Clause on the facts presented. Parties can freely agree to incorporate documents and other agreements by reference, and those incorporated materials can contain a forum selection clause. But a party in Stoops' position must receive the incorporated materials, understand their contents, or be told clearly where they can be found. That is particularly true for a contract of adhesion like the Unit Agreement. Holdco is trying to enforce a secret forum selection clause. That is unreasonable.

Regardless of whether Oklahoma law or Delaware law applies, the Delaware Forum Clause cannot support the exercise of personal jurisdiction over Stoops. Holdco's application is denied on that basis.

# I.    FACTUAL BACKGROUND

The facts are drawn from the record developed in connection with Holdco's application for a preliminary injunction.[2] What follows are the facts as they are likely to be found after trial, based on the current record. The court must attempt to predict what the factual findings eventually will be. The findings of fact after trial may be different.

## A.    Bluepeak and Holdco

Bluepeak is a Delaware company headquartered in Colorado that provides fiber-optic services to residential and commercial customers in South Dakota, Minnesota, North Dakota, Wyoming, Texas, and Oklahoma. Bluepeak does not conduct business in Delaware.

Holdco claims to be "a single-purpose Delaware limited partnership formed to hold and administer Bluepeak's equity incentive plan."[3] That is not true. Holdco is a holding company, controlled by a general partner affiliated with the private equity firm GI Partners.[4] Although the record on this issue is sparse, GI Partners appears to have acquired a controlling interest in Bluepeak and used Holdco as one of the entities in the ownership structure. Holdco is not a single-purpose vehicle for an equity compensation plan. It is the holding company through which GI Partners

---

[2] The parties helpfully numbered their exhibits in a single sequence. Citations in the form "Ex. __" refer to those exhibits. Citations in the form "[Name] Dep. __" refer to deposition transcripts.

[3] Dkt. 52 ("OB") at 6.

[4] The General Partner is GI DI Rushmore GP LLC. *See* Ex. 9 ("PA").

controls Bluepeak. Holdco's internal affairs are governed by the Partnership Agreement.

The Partnership Agreement weighs in at 123 pages, without schedules or exhibits. It is easily recognizable as the constitutive document that a private equity firm uses to manage an investment in a portfolio company. Holdco's capital structure is complex, consisting of six classes of units[5] and a lengthy list of entity holders, including both GI Partners affiliates and otherwise.[6]

Consistent with its effort to portray Holdco as a single-purpose vehicle for an equity compensation plan, Bluepeak argues that the court should view Stoops as a partner with a significant equity stake in Holdco.[7] That is not true either. There appear to be two different groups of Bluepeak employees who hold two different classes of equity in Holdco. C-suite executives—including CEO Richard Fish, COO Carl Hagan, and Chief Market Expansion Officer Mike Harry—hold Class A units, which is the same class that a GI Partners' affiliate holds.[8] Other employees receive "Incentive Units."[9]

---

[5] *See* PA § 3.03.

[6] *See* PA, Schedule I. For example, entities affiliated with the private equity firm Ares Capital also appear to have invested in Bluepeak. *Id.*

[7] *See* OB at 8–9.

[8] *See* PA, Schedule I.

[9] *See* PA § 3.04.

5

The Incentive Units are a junior class of equity that comprises a sliver of Holdco's economics. The Incentive Units only pay out on a liquidity event for GI Partners,[10] and they sit at the bottom of a multi-tier waterfall.[11] The Incentive Units do not carry any voting rights at the Holdco level, are non-transferable, and are subject to forfeiture under a variety of situations.[12] The holder of Incentive Units is not a partner in any meaningful sense. The holder of Incentive Units lacks even the more limited rights associated with limited partner status.

## B.    Bluepeak Recruits Stoops.

Stoops has more than thirty years' experience in the telecom and fiber industry. Before joining Bluepeak, Stoops worked in virtually every aspect of the industry, including network buildouts, product development, sales, government affairs, and trading. He had constructed and applied pricing models, generated projections, and built Black-Scholes and Monte Carlo models. [13]

Fish, Bluepeak's CEO, recruited Stoops from another fiber company in 2021. Stoops earned more than $400,000 in salary and bonus with his prior employer. Fish offered Stoops $200,000 and a discretionary bonus of up to 35%. He told Stoops that all of Bluepeak's executives took a haircut on cash compensation in exchange for the

---

[10] Ex. 6 at 3 ("The MIP payout is linked to a liquidation event for GI Partners.").

[11] PA §§ 5.01, 9.03.

[12] PA §§ 4.01, 7.02; Ex. 14 ("UA") §§ 3.01–.02.

[13] In his resume, Stoops described himself as a "[t]op-tier Senior Executive with 30 years of progressively [more] responsible leadership experience." Ex. 3. Holdco understandably embraces that description, but it is puffery.

6

potential equity upside. Fish indicated that he expected Bluepeak to be sold within three years and that a sale would produce generational wealth for Bluepeak's executives.

Bluepeak did not offer Stoops a C-suite role. Bluepeak offered Stoops the position of Vice President – Market Development. Stoops' main function would be government relations, including liaising with city and county officials. That is an important job and a relatively senior one, but not one that carried the ability to bargain over the terms of his equity grant. Stoops could and did negotiate over the number of units he would receive, but not the terms on which he would receive them.

After the initial discussions, Bluepeak emailed Stoops a term sheet that spelled out the key terms of his employment. It identifies Stoops' base salary, annual incentive compensation, and benefits eligibility. It stated that Stoops would be "granted 761,969 Class B-1 Incentive Units and 952,461 Class B-2 Incentive Units of the Management Incentive Pool . . . representing 2.0%" of the Incentive Units.[14] It explained the Incentive Units' tax treatment and the equity distribution waterfall. The term sheet did not contain a choice-of-law provision or forum selection provision.

Stoops believed the units could have a value of between $3-4 million and $8 million.[15] He accepted Bluepeak's offer based on the term sheet and resigned from his prior job. He started work at Bluepeak on June 1, 2021.

---

[14] *See* Ex. 48.

[15] Stoops Dep. 72, 265–266; Ex. 5.

7

In his new role, Stoops managed six employees. He was one of twenty-six Bluepeak employees at the Vice President level or higher. He reported to Harry, then Bluepeak's Chief Business Development Officer and current Chief Market Expansion Officer. Harry reports to Fish, Bluepeak's CEO. Stoops was instrumental to Bluepeak's entry into Oklahoma, just one of the states in which Bluepeak operates.

## C. The Unit Agreement

More than six weeks after Stoops started work, Bluepeak emailed him the Unit Agreement on July 13, 2021.[16] The Unit Agreement is a standard form agreement provided to all employees who receive Incentive Units. Holdco's counsel drafted it to protect Holdco's interests. Stoops could have had a lawyer review it, but Holdco was not going to make any changes.

Stoops executed the Unit Agreement within minutes of receiving it. He noticed that the Unit Agreement listed him as "Desi Stoops" rather than using his formal name, and he asked whether that needed to be corrected. Bluepeak sent him a revised version on July 19, 2021, and Stoops signed and returned it the following day.[17]

The parties to the Unit Agreement are Stoops, defined as the "Participant," and Holdco. The Unit Agreement makes clear that the Incentive Units are a form of compensation tied to the Participant's employment. Consistent with that reality, the Unit Agreement recites that the Incentive Units are being issued "for the provision

---

[16] *See* Ex. 10.

[17] *See* Ex. 13.

8

of services to or for the benefit of the Partnership by the Participant."[18] The Unit Agreement allows the Participant to declare the value of the Incentive Units "as compensation for services" to the extent their value exceeds the price paid, namely zero.[19] The Holdco-prepared election form identifies "[t]he fair market value" of the Incentive Units at the time of issuance as zero.[20]

The recitals to the Unit Agreement state that its purpose is "to impose certain vesting conditions with respect to the Incentive Units."[21] The recitals do not mention restrictive covenants.

The Unit Agreement contains a vesting schedule providing that as long as Stoops remains employed at Bluepeak, then one-sixth of the Incentive Units vest after one year. After that, another one-twenty-fourth vest every succeeding quarter, so that vesting is complete after six years. [22] Vesting accelerates on a Change in Control, a term defined in the Partnership Agreement.[23]

The Unit Agreement provides that a Participant who stops working for Bluepeak for any reason forfeits any unvested units.[24] A Participant forfeits all units,

---

[18] UA, recital B.

[19] *Id.* Ex. B.

[20] *Id.* Ex. B, ¶ 5.

[21] *Id.* recital C.

[22] *Id.* § 2.3(a)(i).

[23] *Id.* § 2.3(a)(ii).

[24] *Id.* § 3.1.

including vested units, if the Participant "breaches any non-competition, non-solicitation and/or confidentiality obligations."[25]

Titled "Restrictive Covenants," Article VI of the Unit Agreement imposes a series of restrictive covenants on the Participant that typically would appear in an employment agreement. There are four principal restrictive covenants (the "Covenants"):

- A restriction prohibiting the Participant from competing with Bluepeak (the "Competition Restriction");

- A restriction prohibiting the Participant from soliciting Bluepeak's employees, agents, and independent contractors (the "Personnel-Solicitation Restriction");

- An expansive restriction on the Participant's use of Bluepeak's confidential information, broadly defined (the "Confidentiality Restriction"); and

- An expansive restriction on the Participant disparaging GI Partners or its affiliates (the "Disparagement Restriction").

The Competition Restriction, Personnel-Solicitation Restriction, and Confidentiality Restriction last "[d]uring the term of the Participant's employment with the Partnership or one of its Subsidiaries (the 'Employment Term') and for a period of twenty-four months thereafter (the 'Restricted Period')."[26] There is no time limit on

---

[25] *Id.* § 3.2. The Incentive Units were subject to repurchase on terms set out in the Partnership Agreement. *Id.* § 3.3; *see also* PA § 7.07(a).

[26] UA § 6.1(a)–(c).

the Disparagement Restriction.[27] Even if the Participant loses all of the Incentive Units that supported the Covenants, the Covenants continue to apply.[28]

Although not at issue in this case, Section 6(e) of the Unit Agreement addresses "Inventions."[29] It provides broadly that any inventions or developments the Participant creates during the Employment Term becomes the Holdco's property. That is another provision that classically appears in an employment agreement.

Implicitly recognizing the obvious connection between those provisions and the Participant's employment, the Unit Agreement provides that if the Participant is a party to an employment agreement containing different restrictive covenants, then those terms apply in lieu of the Covenants.[30] The Unit Agreement also takes pains to specify that it does *not* create any right to remain employed. In a provision titled "No Contract of Employment," the Unit Agreement states:

> Neither this Agreement nor any award granted under this Agreement shall confer upon any Person any right of employment or other service or continuance of employment or other service by the Partnership or any of its Subsidiaries or Affiliates. This Agreement does not constitute a contract of employment . . . .[31]

That provision would not be necessary if the Unit Agreement did not contain provisions so obviously and expressly directed to the Participant's employment.

---

[27] *Id.* § 6.1(d).

[28] *Id.* § 7.2.

[29] *Id.* § 6.1(e).

[30] *Id.* § 6.1.

[31] *Id.* § 7.14.

The Unit Agreement contains the following provision selecting Delaware law (the "Delaware Law Provision"):

> This Agreement, and any and all claims arising out of, under, pursuant to, or in any way related to this Agreement, including but not limited to any and all claims (whether sounding in contract or tort) as to this Agreement's scope, validity, enforcement, interpretation, construction, and effect, shall be governed by the laws of the State of Delaware (without regard to any conflict of laws rule which might result in the application of the laws of any other jurisdiction).[32]

The Unit Agreement does not contain a provision making courts located in Delaware the exclusive forum for disputes arising out of or related to the agreement.

## D.  The Missing Partnership Agreement

The Unit Agreement contains a recitation in which the Participant agrees to having received and reviewed the Partnership Agreement.[33] In reality, Bluepeak did not provide a copy of the Partnership Agreement when presenting Stoops with the

---

[32] *Id.* § 7.12.

[33] *Id.* § 7.7. Other aspects of the Unit Agreement refer to the Partnership Agreement. A recital states that Holdco "is governed by the Amended and Restated Agreement of Limited Partnership [of Holdco] dated as of February 1, 2021 (as the same may be further amended, restated, modified, or otherwise supplemented from time-to-time in accordance with its terms, . . .)" i.e., the Partnership Agreement. *Id.*, recital A. The Unit Agreement provides generally that "[c]apitalized terms not otherwise defined in this Agreement shall have the meaning described to such terms in the Partnership Agreement." *Id.* Later, the Unit Agreement listed nine specific terms, each of which had "the meaning ascribed to such term in the Partnership Agreement." *Id.* § 5.1. The Unit Agreement's integration clause incorporates the Partnership Agreement. *Id.* § 7.6. Another provision states that that "the Incentive Units are subject to the Partnership agreement, the terms and provisions of which are hereby incorporated herein by reference." *Id.* § 7.7. It is not possible to understand the terms of the Unit Agreement without a copy of the Partnership Agreement.

Unit Agreement, nor did Bluepeak tell Stoops where he could find the Partnership Agreement or that he could request it.

Stoops asked for a copy of the Partnership Agreement on multiple occasions.[34] He never received a copy and never had the opportunity to understand its contents until Holdco sued him.

Holdco treats its Partnership Agreement as confidential, and only a few C-suite executives have seen it. In this litigation, Holdco marked the Partnership Agreement "HIGHLY CONFIDENTIAL."

The Partnership Agreement contains the Delaware Forum Clause. It states:

*Submission to Jurisdiction*. Each of the parties hereto submits to the exclusive jurisdiction of the Chancery Court of the State of Delaware and any state appellate court therefrom within the State of Delaware (or if the Chancery Court of the State of Delaware declines to accept jurisdiction over a particular matter, any federal court sitting in the State of Delaware and any federal appellate court therefrom) in respect of the interpretation and enforcement of the provisions of this Agreement and any related agreement, certificate or other document delivered in connection herewith and by this Agreement waive, and agree not to assert, any defense in any action for the interpretation or enforcement of this Agreement and any related agreement, certificate or other document delivered in connection herewith that they are not subject to such jurisdiction or that such action may not be brought or is not maintainable in such courts or that this Agreement may not be enforced in or by such courts, that the action is brought in an inconvenient forum, or that the venue of the action is improper.[35]

---

[34] *See, e.g.*, Exs. 53–56.

[35] PA § 13.02.

The Partnership Agreement does not contain any restrictive covenants. To the contrary, it eliminates fiduciary duties, disclaims any right to business opportunities, and waives any objection to competitive activities by partners.[36]

### E.  Stoops Considers Leaving Bluepeak.

In 2024, Stoops considered leaving Bluepeak. Three years had passed since he joined the company, and no liquidity event was in sight. Stoops also wanted a less stressful employment situation due to health concerns.

Stoops drafted emails to a recruiter[37] and prepared a resignation email.[38] He talked to a number of potential employers, including Francisco Maella, then-CEO of Dobson Fiber.[39] Stoops also met with Everett Dobson, the company's board chair and namesake. Dobson competes with Bluepeak, and Stoops' conversations with Dobson reached the point where they signed a joint defense agreement under which Dobson would pay for counsel for Stoops if he left.[40]

Stoops also spoke with Patricia Martin, a longtime friend who was then CEO of Point Broadband. That company did not compete with Bluepeak. In 2025, Stoops sent his resume to Martin and spoke with her about becoming Point Broadband's

---

[36] *Id.* §§ 13.16–.18.

[37] Ex. 15.

[38] Ex. 16.

[39] The company's full name is Dobson Technologies Inc. It does business as Dobson Fiber.

[40] *See* Stoops Dep. 167; Ex. 4 at 54.

head of commercial sales and operations. He met twice with Martin and Nick DiPonzio, her COO. He also met with Point Broadband's general counsel several times.

Stoops was not guarded in his discussions about possible employment, and he said things that create litigable issues under the Confidentiality Restriction and Disparagement Restriction. During a videoconference with Martin and DiPonzio, Stoops shared his Bluepeak laptop screen and showed them a spreadsheet with modeling information. Bluepeak contends that the information was confidential. Stoops contends it was simply modeling calculations that he had long known how to do. Stoops also shared his views on various Oklahoma markets, including what tactics worked and what did not. Bluepeak contends this information was confidential, but it seems like general market impressions that Stoops had developed over the years.

In October 2025, Martin asked Stoops what specific companies he could not work for in Oklahoma because of the Covenants. He replied "Dobson."[41]

## F.  Stoops Leaves Bluepeak.

In early 2026, Martin became CEO at Dobson. She approached Stoops about joining as COO. Stoops knew that he risked violating the Competition Restriction by taking a job with Dobson.

Stoops again was not guarded in his discussions, and he did things that create litigable issues under the Covenants. For example, on March 10, 2026, the same day he interviewed with Martin for the COO position, Stoops accessed several Bluepeak

---

[41] Ex. 4 at 12–13.

15

market expansion documents. The parties disagree about the significance of the information they contain. A week later, he sent Martin screenshots of a Bluepeak senior management team chat. Stoops should not have done that, but the contents of the screenshots do not seem significant.

On April 2, 2026, Stoops accepted Martin's offer. He accessed several Bluepeak market expansion documents on that day and another the day before.

During his discussions with Martin, Stoops suggested that some Bluepeak employees might be good hires. He specifically mentioned Billy Parker, a former Bluepeak employee. He also criticized Bluepeak in a conversation with Tamara Ostrander, who was still a Bluepeak employee.[42]

On April 3, 2026, Stoops resigned from Bluepeak, effective April 17, 2026. On Friday, April 14, 2026, his last day of employment at Bluepeak, Stoops texted Bob Tinkler, his college fraternity brother and the CFO of Manhattan Construction. Stoops told Tinkler he was leaving Bluepeak to become "COO of Dobson." He suggested Tinkler send him an email on Monday at his Dobson address.[43]

On Sunday, April 16, 2026, Stoops represented that he would return all physical copies and delete any digital copies of Bluepeak data within three calendar days.[44] Discovery in this litigation has shown that Stoops had a number of Bluepeak

---

[42] Stoops Dep. 222–236; Ex. 20 at 550–51.

[43] Ex. 23 at 431–32.

[44] *See* Ex. 29.

documents on his devices.[45] Stoops' lawyer has represented that Stoops would have deleted those documents, but this litigation intervened, resulting in a preservation obligation.

## G.  This Litigation

On April 20, 2026, Holdco filed this action. On April 29, the court issued a temporary restraining order to preserve the status quo pending a hearing on Holdco's application for preliminary injunction.[46] The TRO allowed Dobson to pay Stoops as an employee, but barred Stoops from working on any competitive projects or using any of Bluepeak's confidential information.

Over the following weeks, the parties engaged in expedited discovery. A preliminary injunction hearing took place on May 22, 2026.

## II.    THE PROCEDURAL STANDARD

Holdco seeks a preliminary injunction enjoining Stoops from breaching the Covenants.

> When seeking a preliminary injunction, a plaintiff must demonstrate a reasonable probability of success on the merits and that some irreparable harm will occur in the absence of the injunction. Furthermore, in evaluating the need for a preliminary injunction, the Court must balance the [moving party's] need for protection against any harm that can reasonably be expected to befall the [non-moving party] if the injunction is granted.[47]

---

[45] *See, e.g.*, Exs. 30–42.

[46] *See* Dkt. 24.

[47] *Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1278–79 (Del. 1989) (citations omitted).

17

The court is not required to weigh the elements equally, and a strong showing on one element can compensate for a weaker showing on another.[48]

"On a motion for a preliminary injunction, the Court considers the question of personal jurisdiction part of the question of reasonable likelihood of success on the merits."[49] If the plaintiff cannot establish a reasonable likelihood that the court can exercise personal jurisdiction over a defendant, then the action likely cannot proceed against that defendant, and the prospect of success on the merits falls short.[50] Here, the application fails on this basis. Although there are other hurdles that the application would struggle to clear, the court need not reach them.

## III. PERSONAL JURISDICTION

Holdco contends that it can sue Stoops in Delaware because of the Delaware Forum Clause in the Partnership Agreement. Stoops has no other ties to Delaware, so the Delaware Forum Clause provides the only basis for suing him here. Because

---

[48] *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 579 (Del. Ch. 1998); *see also In re Estate of Wolhar*, 2018 WL 721417, at *3 (Del. Ch. Feb. 6, 2018) (explaining that "[s]ome showing is required for each element").

[49] *See Next Level Ventures, LLC v. AVID USA Techs. LLC*, 2023 WL 3141054, at *19 (Del. Ch. Mar. 16, 2023).

[50] *NOLU Plastics, Inc., v. Ledingham*, 2005 WL 5654418, at *2 (Del. Ch. Dec. 17, 2005) (considering application for preliminary injunction where defendant challenged personal jurisdiction; "There being no personal jurisdiction over Valu Engineering, I must determine if the action against Ledingham has any substantive basis to proceed."); *id.* at *3 ("There being no personal jurisdiction over Valu Engineering and there being no subject matter jurisdiction regarding the buy-sell provisions of the Operating Agreement, Nolu cannot demonstrate a reasonable likelihood of success on the merits—a prerequisite to the Court's granting a preliminary injunction.").

the Delaware Forum Clause is either invalid or unenforceable, this court cannot exercise personal jurisdiction over Stoops. Holdco's application for a preliminary injunction must be denied.

"Generally, a plaintiff does not have the burden to plead in its complaint facts establishing a court's personal jurisdiction over [a] defendant."[51] But when a defendant challenges personal jurisdiction, the plaintiff must show a basis for its existence.[52]

A defendant can consent to a court's exercise of personal jurisdiction. As the Supreme Court of the United States has recognized, "the personal jurisdiction requirement is a waivable right[, and] there are a 'variety of legal arrangements' by which a litigant may give 'express or implied consent to the personal jurisdiction of the court.'"[53] One such arrangement is a forum selection clause in a contract: "Where the parties to the forum selection clause have consented freely and knowingly to the

---

[51] *Benerofe v. Cha*, 1996 WL 535405, at *3 (Del. Ch. Sept. 12, 1996).

[52] *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007).

[53] *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985) (citations omitted); *accord Genuine Parts Co. v. Cepec*, 137 A.3d 123, 130 (Del. 2016); *Nat'l Indus. Gp. (Hldg.) v. Carlyle Inv. Mgmt. L.L.C.*, 67 A.3d 373, 381 (Del. 2013); *see Sternberg v. O'Neil*, 550 A.2d 1105, 1109 n.4 (Del. 1988) ("A party may submit to a given court's jurisdiction by contractual consent."), *abrogated on other grounds* by *Genuine Parts*, 137 A.3d at 123; *see also Ins. Corp. of Ir., Ltd. v. Compagnie de Bauxites de Guinee*, 456 U.S. 694, 703 (1982) ("Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived."); *Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 316 (1965) ("[P]arties to a contract may agree in advance to submit to the jurisdiction of a given court . . . ."); *Petrowski v. Hawkeye-Sec. Ins. Co.*, 350 U.S. 495, 495–96 (1956) (holding that stipulation to personal jurisdiction in particular forum is valid waiver of individual right).

court's exercise of jurisdiction, the clause is sufficient to confer personal jurisdiction on a court."[54]

There are two impediments to Holdco's reliance on the Delaware Forum Clause. First, the Delaware Forum Clause is invalid because it conflicts with controlling Oklahoma law. Second, assuming Delaware law applies, the facts of the case call for not enforcing the Delaware Forum Clause.

## A. Invalidity Under Oklahoma Law

Stoops contends that the Delaware Forum Clause conflicts with an Oklahoma statute that invalidates contractual provisions that limit access to Oklahoma courts (the "Oklahoma Access Statute"). It states:

> Every stipulation or condition in a contract, by which any party thereto is restricted from enforcing his rights under the contract by the usual

---

[54] *Carlyle*, 67 A.3d at 381; *accord Burger King*, 471 U.S. at 472 n.14 ("Where such forum selection provisions have been obtained through 'freely negotiated' agreements and are not 'unreasonable and unjust,' their enforcement does not offend due process." (citation omitted)); *Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209, 1228 (Del. 2018) ("Where a party commits to the jurisdiction of a particular court or forum by contract, such as through a forum selection clause, a 'minimum contacts' analysis is not required as it should clearly anticipate being required to litigate in that forum." (footnote omitted)); *Genuine Parts*, 137 A.3d at 148 ("[A] party to a non-adhesion contract can subject itself to personal jurisdiction via a forum selection clause."); *see* R. Franklin Balotti & Jesse A. Finkelstein, *Delaware Law of Corporations and Business Organizations* § 13.4[A] (3d ed. 2019) ("Consent to personal jurisdiction is considered a waiver of any objection on due process grounds and an analysis under minimum contacts is unnecessary." (internal quotation marks omitted)); *see also* Charles Alan Wright et al., *Federal Practice & Procedure* § 1067.3 (4th ed.), Westlaw (database updated Apr. 2026) ("[P]ersonal jurisdiction can be based on the defendant's consent to have the case adjudicated in the forum, or the defendant's waiver of the personal jurisdiction defense. Conduct that has been held to constitute consent or a constructive waiver often includes . . . entering into an agreement with a forum selection clause . . . ." (footnotes omitted)).

legal proceedings in the ordinary tribunals, or which limits the time within which he may thus enforce his rights, is void. [55]

As someone who lives and works in Oklahoma, Stoops ordinarily could litigate over his right to work for Dobson in an Oklahoma court. The Delaware Forum Clause is a "stipulation . . . in a contract" that limits Stoops' access to the Oklahoma courts. Because of that stipulation, Stoops faces litigation in Delaware. Stoops concludes that under the Oklahoma Access Statute, the Delaware Forum Clause is void.

Holdco responds that Oklahoma law does not apply because of the Delaware Law Provision. Holdco also argues that even if the Oklahoma Access Statute did apply, it would not invalidate the Delaware Forum Clause.

Neither of Holdco's arguments prevails. Oklahoma law governs—at a minimum for purposes of an action to enforce the Covenants. The Oklahoma Access Statute therefore applies. That statute renders the Delaware Forum Clause invalid. The Delaware Forum Clause cannot support this court's exercise of personal jurisdiction over Stoops.

### 1. The Choice-Of-Law Analysis

Because of the potential applicability of the Oklahoma Access Statute, the validity of the Delaware Forum Clauses turns initially on choice of law. Delaware follows the *Restatement (Second) of Conflict of Laws* when determining what law governs a contract.[56] The *Restatement* provides that if the parties to a contract have

---

[55] 15 Okla. Stat. § 15-216.

[56] *Certain Underwriters at Lloyds, Condon v. Chemtura Corp.*, 160 A.3d 457, 464 (Del. 2017).

selected the law of a particular jurisdiction to govern their agreement, then that law

will apply unless either

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.[57]

Here, the Delaware Law Provision passes muster under the first test but fails under

the second.

### a. Delaware Has A Substantial Relationship To The Parties Or The Transaction.

The first step in evaluating a contractual choice-of-law provision is to

determine whether the contract selects the law of a state with "no substantial

relationship to the parties or the transaction and there is no other reasonable basis

for the parties' choice."[58] The Unit Agreement selects Delaware law, which has a

sufficient relationship to the parties and the transaction to be a viable selection.

Commentary in the *Restatement* explains that "[w]hen the state of the chosen

law has some substantial relationship to the parties or the contract," then the parties

have a reasonable basis for their choice of law.[59] The commentary observes that a

---

[57] *Restatement (Second) of Conflict of Laws* § 187 (1971) [hereinafter *Restatement*].

[58] *Id.* § 187(a).

[59] *Id.* cmt. f.

22

substantial relationship exists "when [the chosen] state is . . . where one of the parties is domiciled."[60] Holdco is a Delaware limited partnership, making Delaware its domicile. That connection provides a reasonable basis for selecting Delaware law.[61]

In addition, a Delaware statute constrains the inquiry. When a contract governs a transaction involving $100,000 or more and states that it "shall be governed by or construed under the laws of this State, without regard to principles of conflict of laws," then that provision standing alone "shall conclusively be presumed to be a significant, material and reasonable relationship with this State and shall be enforced whether or not there are other relationships with this State."[62] The Delaware Law Provision alone therefore establishes a significant, material, and reasonable relationship with Delaware that provides a reasonable basis for selecting Delaware law.

### b. Oklahoma Is The Default State.

The next step in the choice-of-law analysis is to determine "what state's law would apply *but for* the Delaware choice-of law provision."[63] Oklahoma is that state.

---

[60] *Id.*

[61] *See id.*

[62] 6 *Del. C.* § 2708(a).

[63] *FP UC Hldgs., LLC v. Hamilton*, 2020 WL 1492783, at *9 (Del. Ch. Mar. 27, 2020).

Absent a binding choice-of-law clause, the *Restatement* calls for applying the law of the jurisdiction with the most significant relationship to the issue in dispute.[64] A court identifies that jurisdiction by considering:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.[65]

Specific sections in the *Restatement* provide guidance on how to apply the factors to particular types of disputes.[66]

Importantly, a court is "not bound to decide all issues under the local law of a single state."[67] "Each issue is to receive separate consideration if it is one which would be resolved differently under the local law rule of two or more of the potentially

---

[64] *See Certain Underwriters*, 160 A.3d at 465.

[65] *Restatement, supra*, § 6(2).

[66] *See Certain Underwriters*, 160 A.3d at 465.

[67] *Restatement, supra*, § 188 cmt. d.

interested states."[68] Local law could supplant a choice-of-law provision as to one issue, but not as to another.[69]

The provisions at issue are the Covenants, where the *Restatement* balancing weighs decidedly in favor of Oklahoma. Not one of the *Restatement* factors favors Delaware.

To reiterate, specific sections of the *Restatement* establish presumptions for the law that governs particular types of contracts.[70] The provision governing contracts for personal services states:

> The validity of a contract for the rendition of services and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the local law of the state where the contract requires that the services, or a major portion of the services, be rendered, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.[71]

---

[68] *Id.*

[69] *Focus Fin. P'rs, LLC v. Holsopple*, 241 A.3d 784, 806 (Del. Ch. 2020); *accord CNH Am., LLC v. Am. Cas. Co. of Reading, Pa.*, 2014 WL 626030, at *7 (Del. Super. Jan. 6, 2014) ("if warranted, the law of one state may be found to apply to some issues, while the law of another state may be found to apply to others").

[70] *Certain Underwriters*, 160 A.3d at 465; *see also Restatement*, *supra*, §§ 189–197.

[71] *Restatement*, *supra*, § 196. This rule "applies to contracts with servants, independent contractors and agents and with persons exercising a public profession, as lawyers, doctors, brokers, commission agents and factors." *Id.* cmt. a.

When local law applies under this section, it governs "the validity of a clause forbidding the employee from entering a business competitive with that of the employer for a stated period after the termination of the employment."[72]

The Covenants address Stoops' ability to provide personal services, so that section of the *Restatement* applies. Under its terms, the "place where the major portion of the services would be rendered" is presumptively the default state.[73] Stoops worked in Oklahoma and is allegedly breaching the Covenants through his activities in Oklahoma. Oklahoma is therefore the default state for purposes of the Covenants.

That result accords with how the *Restatement* recommends applying the choice-of-law factors for purposes of a breach of contract generally. It calls for considering:

> (a) the place of contracting,
>
> (b) the place of negotiation of the contract,
>
> (c) the place of performance,
>
> (d) the location of the subject matter of the contract, and

---

[72] *Id.* The preference for the place of performance "enjoys greatest significance when the work is to be more or less stationary and is to extend over a considerable period of time." *Id.* cmt. b. The place of performance is less significant "when the employee's duties will require him to travel with fair frequency between two or more states." *Id.* But even then, "the place where the major portion of the services is to be rendered, provided that there is such a place, is the contact that will be given the greatest weight in determining, with respect to most issues, the state of the applicable law." *Id.*

[73] *Id.* § 196; *accord id.* cmt. b (looking to where the parties contemplated that a "majority of the work" would occur).

(e) the domicil[e], residence, nationality, place of incorporation and place of business of the parties.[74]

When the places of negotiation and performance are the same, "the local law of this state will usually be applied."[75]

Those factors all point to Oklahoma. The first factor is the place of contracting. Under the *Restatement*, "the place of contracting is the place where occurred the last act necessary, under the forum's rules of offer and acceptance, to give the contract binding effect."[76] That factor points to Oklahoma, where Stoops executed the Unit Agreement. That said, "[s]tanding alone, the place of contracting is a relatively insignificant contact."[77] That factor nevertheless points to Oklahoma.

The second factor is the place of the negotiations. The *Restatement* treats this as "a significant contact" but "of less importance when there is no one single place of negotiation and agreement, as, for example, when the parties do not meet but rather conduct their negotiations from separate states by mail or telephone."[78] Here, no negotiations took place. The Unit Agreement is a standard-form contract that Holdco presented to Stoops in Oklahoma on a take-it-or-leave it basis. That factor also points to Oklahoma.

---

[74] *Id.* § 188.

[75] *Id.*

[76] *Id.* cmt. e.

[77] *Id.*

[78] *Id.*

27

The third factor is the most important: place of performance.[79] Stoops' performance under the Covenants—including his alleged breach—took place in Oklahoma.[80]

The fourth factor considers the location of the contract's subject matter. Because the Covenants concerned Stoops, the contract's subject matter was in Oklahoma, where Stoops lived and worked.[81]

The last factor considers the domicile, residence, state of incorporation, or principal place of business of the parties. Stoops' domicile, residence, and principal place of business are in Oklahoma. Holdco is a holding company that lacks any office or employees and has no principal place of business. Holdco is a Delaware entity, but *Restatement* explains that "with respect to most issues, a corporation's principal place of business is a more important contact than the place of incorporation, and this is

---

[79] *Id.*

[80] The Unit Agreement also addresses the granting, vesting, payout, and potential cancellation of the Incentive Units. Even though a Delaware entity issued the Incentive Units, performance under those provisions also took place in Oklahoma. Under the Delaware Limited Partnership Act, partnership interests like the Incentive Units are intangible personal property. 6 *Del C.* § 17-701. Intangible personal property is located with its owner. *Timoria LLC v. Anis*, 346 A.3d 1166, 1180 (Del. Ch. 2025). Consequently, even the granting, vesting, payout, and potential cancellation of the Incentive Units took place in Oklahoma, where Stoops was. But unlike the Covenants, those are internal affairs issues, and Delaware law governs them. *CCSB Fin. Corp. v. Totta*, 302 A.3d 387, 404 (Del. 2023).

[81] The same is true for the provisions addressing the granting, vesting, payout, and potential cancellation of the Incentive Units. The subject matter of those provisions was the Incentive Units. As intangible personal property, they were co-located with him in Oklahoma. But again, those are internal affairs issues, so Delaware law governs.

particularly true in situations where the corporation does little, or no, business in the latter state."[82] This factor favors Oklahoma.

Under the *Restatement*, when the places of negotiation and performance are the same, "the local law of this state will usually be applied."[83] That state is Oklahoma. But for the Delaware Law Provision, Oklahoma law would govern.

### c. The Existence Of A Conflict

The next step in the choice-of-law analysis is to determine "if there is an actual conflict between the laws of the different states that each party urges should apply."[84] To answer this question, a court compares the laws of the competing jurisdictions to determine whether they actually conflict on a relevant point.[85]

A true conflict exists between Oklahoma and Delaware law over the effectiveness of the Delaware Forum Clause. The Oklahoma Access Statute limits the effectiveness of choice-of-forum and choice-of-law provisions. By contrast, Delaware law generally enforces those provisions.[86]

---

[82] *Restatement, supra,* § 188 cmt. e.

[83] *Id.* § 188.

[84] *Certain Underwriters*, 160 A.3d at 464 (citations omitted).

[85] *See, e.g., Deuley v. DynCorp Int'l, Inc.,* 8 A.3d 1156, 1162–65 (Del. 2010) (comparing laws of Delaware and Dubai); *Silverberg v. Padda*, 2019 WL 4566909, at *12 & n.78 (Del. Ch. Sept. 19, 2019) (comparing pleading requirements of three jurisdictions).

[86] *See, e.g., Carlyle*, 67 A.3d at 381; *J.S. Alberici Const. Co. v. Mid–West Conveyor Co.*, 750 A.2d 518, 520 (Del. 2000).

A true conflict also exists between Oklahoma law and Delaware law over the law governing the Covenants. By statute, Oklahoma limits restrictive covenants. The statute of general application states: "Every contract by which any one is restrained from exercising a lawful profession, trade or business of any kind, otherwise than as provided by Sections 218 and 219 of this title, or otherwise than as provided by Section 2 of this act, is to that extent void."[87] All of the Covenants potentially implicate this statute.[88]

> Oklahoma specifically restricts covenants not to compete. That statute states:
>
> A. A person who makes an agreement with an employer, whether in writing or verbally, not to compete with the employer after the employment relationship has been terminated, shall be permitted to engage in the same business as that conducted by the former employer or in a similar business as that conducted by the former employer as long as the former employee does not directly solicit the sale of goods, services or a combination of goods and services from the established customers of the former employer.
>
> B. Any provision in a contract between an employer and an employee in conflict with the provisions of this section shall be void and unenforceable.[89]

The Competition Restriction conflicts with that statute.

Holdco attempts to negate the conflict by citing a special Oklahoma statute addressing competition restrictions for partners. It states:

> Partners may, upon or in anticipation of a dissolution of the partnership, agree that none of them will carry on a similar business within a

---

[87] 15 Okla. Stat. § 15-217.

[88] That said, another Oklahoma statute likely exempts the Personnel-Solicitation Restriction from its scope. 15 Okla. Stat. § 15-219B.

[89] 15 Okla. Stat. § 15-219A.

specified county and any county or counties contiguous thereto, or a specified city or town or any part thereof. Provided, that any such agreement which is otherwise lawful but which exceeds the territorial limitations specified by this section may be deemed valid, but only within the county comprising the primary place of the conduct of the business of the subject partnership and within any counties contiguous thereto.[90]

The Competition Restriction conflicts with that statute as well. The Competition Restriction goes beyond what the statute authorizes for partners and does not contemplate a restriction upon or in anticipation of dissolution. In any event, a holder of Incentive Units lacks the rights of a partner. A holder of Incentive Units even lacks the rights normally associated with a limited partner, such as the right to vote.

Multiple true conflicts therefore exist between Oklahoma and Delaware law.

### d. Resolving The Conflict

The last step in the conflict-of-laws analysis requires determining which state's law controls. Here, Oklahoma law has the greater interest in the Oklahoma Access Statute and the Oklahoma statutes governing restrictive covenants.

When a true conflict exists, the *Restatement* explains when a court should permit the default state's local law to override a specifically bargained-for contract provision. The *Restatement* cautions that a court should only apply the default state's local law to strike down a contractual provision if the state's interest in having its law applied substantially outweighs the parties' expectations.[91]

---

[90] 15 Okla. Stat. § 15-219.

[91] *Restatement, supra,* § 188 cmt. b.

The Delaware Law Provision, Delaware Forum Clause, and Covenants were not specifically bargained for. They were presented on a take-it-or-leave it basis.

Regardless, an example the *Restatement* provides specifically fits this case:

> [T]he state where a party to the contract is domiciled has an obvious interest in the application of its contract rule designed to protect that party against the unfair use of superior bargaining power. And a state where a contract provides that a given business practice is to be pursued has an obvious interest in the application of its rule designed to regulate or to deter that business practice.[92]

That example is tailor-made for the conflict between Oklahoma law and Delaware law over the Covenants.

Oklahoma also has the overriding interest in the Oklahoma Access Statute. Interpreting an Idaho statute that tracks the Oklahoma Access Statute, the United States Court of Appeals for the Ninth Circuit held that the statute reflected "a strong public policy" that overrode a forum selection clause.[93] A seminal Oklahoma state court decision also declined to enforce a choice-of-forum provision in an employment agreement presented on a take-it-or-leave-it basis.[94]

---

[92] *Id.* cmt. a.; *accord id.* cmt. e (noting that "the state where performance is to occur has an obvious interest in the question whether this performance would be illegal").

[93] *Gemini Techs., Inc. v. Smith & Wesson Corp.*, 931 F.3d 911, 916 (9th Cir. 2019).

[94] *Eads v. Woodmen of the World Life Ins. Soc.*, 785 P.2d 328, 330–32 (Okla. Civ. App. 1989). Subsequent cases have enforced reasonable forum selection clauses. *E.g.*, *Adams v. Bay, Ltd.*, 60 P.3d 509, 511 (Okla. Civ. App. 2002). *Eads* nevertheless remains good law as to take-it-or-leave-it agreements. *See STI Trucking, LLC v. Santa Rosa Operating, LLC*, 2021 WL 3604609, at *9 (N.D. Okla. Aug. 13, 2021) (applying *Eads* "where the parties have not negotiated or agreed upon [the forum

For the matters at issue here, Oklahoma has the predominant interest. Through the Oklahoma Access Statute and Oklahoma's statutes limiting restrictive covenants, Oklahoma seeks to protect its citizens against the unfair use of superior bargaining power by regulating specific business practices.[95] That substantial policy interest takes precedence over Delaware's generalized interest in freedom of contract.

Holdco attempts to portray this case as involving the internal affairs of a Delaware limited partnership, but that is not accurate. Holdco and Bluepeak did not induce Stoops to invest in Holdco. They induced him to work for Bluepeak. This is not a case about the governance of a Delaware limited partnership or the allocation of equity to a partner. Holdco is trying to bar Stoops from working for a competitor because he worked for Bluepeak.

If this case truly involved the internal affairs of a Delaware entity, then Delaware would have a substantial interest. But this case implicates the external

---

selection clause] as a term of their contract"); *Howard Fam. Charitable Found., Inc. v. Trimble*, 259 P.3d 850, 862 (Okla. Civ. App. 2011) (same).

[95] *See* Cara Reichard, *Keeping Litigation at Home: The Role of States in Preventing Unjust Choice of Forum*, 129 Yale L.J. 866, 871–72 (2020) ("Crucially, states do have the power to regulate choice-of-forum clauses through general contract law . . . . Restricting adjudication to a forum far from the homes or jobs of would-be plaintiffs can place justice, quite literally, beyond their reach . . . . State action carries particular importance given the power and resource disparities between corporate actors and individual plaintiffs. Large corporate powers today have nearly every advantage over the individuals with whom they contract, not least because they prescribe the terms of those contracts. Anti-choice-of-forum laws, including those already adopted by many states, offer a rare opportunity to redistribute power by ensuring that, in the event of a legal claim, the forum is one that does not disadvantage the relatively powerless individual. In litigation against corporate entities, individuals already face enough challenges.").

affairs of a Delaware entity.[96] As the Delaware Supreme Court has explained, a "corporation's relationships with its employees" fall outside of the internal affairs doctrine.[97] "Corporations and individuals alike enter into contracts, commit torts, and deal in personal and real property . . . . The internal affairs doctrine has no applicability in these situations."[98] The same is true for a Delaware limited partnership.

Citing *Parks*,[99] Holdco argues that Delaware law should apply so that the Covenants receive uniform interpretation regardless of where the recipients of Incentive Units live or work. Holdco argues that unless Delaware law applies universally, a single Delaware partnership agreement could be interpreted differently in different states, gutting the purpose of selecting Delaware law.

*Parks* was not an employment case; it involved the sale of a business.[100] Restrictive covenant disputes fall along a spectrum with discernable bands. The band

---

[96] *Econ. Steel Bldg. Techs., LLC v. E. W. Constr., Inc.*, 2020 WL 1866869, at *3 (Del. Super. Apr. 14, 2020) ("If the issues involved internal affairs of a Delaware LLC, the State of Delaware would have a substantial interest. Here, however, the issues involve external affairs of a Delaware LLC.").

[97] *Salzberg v. Sciabacucchi*, 227 A.3d 102, 134 (Del. 2020) (internal quotations omitted).

[98] *McDermott Inc. v. Lewis*, 531 A.2d 206, 214–15 (Del. 1987).

[99] *Parks v. Horizon Hldgs., LLC*, 2022 WL 2821337, at *10–12 (Del. Ch. July 20, 2022).

[100] *Id.* at *1 (explaining that *Parks* involved "the sale of assets of an Oklahoma boat-building company, the (now-terminated) employment of the sellers by the Delaware LLC created by the buyer to facilitate the deal, and the resulting membership of those sellers—the Plaintiffs here—in a second LLC affiliated with the

calling most strongly for respecting a Delaware choice-of-law provision, applying a Delaware forum selection provision, and taking a pro-enforcement stance towards restrictive covenants involve sales of businesses. That is a horizontal contracting scenario between parties that likely have similar bargaining power. Parties in that setting can readily select governing law and a preferred forum, and the terms of any restrictive covenants are likely both negotiated and priced. The buyer who purchases the business and pays for its associated goodwill deserves the protection that restrictive covenants provide. Even states that otherwise constrain restrictive covenants often permit them in this setting.

The next strongest case for applying Delaware law, enforcing a Delaware forum selection provision, and taking a pro-enforcement approach to restrictive covenants involves flat—often small—organizations formed as general partnerships or joint ventures (or alterative entities designed to mimic those structures). That too is a horizontal contracting scenario between parties that likely have similar bargaining power. The business principals can use a Delaware entity agreement as the primary contract that governs their relationships, and they can build restrictive covenants into that agreement to bind themselves mutually for the benefit of their joint enterprise.

---

buyer, subject to restrictive covenants which would be unenforceable—at least in part—under the laws of the Plaintiffs' home state, Oklahoma.").

The calculus changes when moving from horizontal to vertical scenarios. The latter involve a business or its principals contracting with an individual whose principal value lies in their ability to work. Again, there is no one-size-fits-all approach, but there are recurring patterns in vertical contracting.

The first involves a C-suite executive or other top business leader. That person likely has significant bargaining power and can negotiate the terms of the relationship. A top business leader—often with the help of counsel—can haggle over restrictive covenants, evaluate the implications of a jurisdiction's law, and take on the burden of litigating in a faraway forum. A court can take a relatively pro-enforcement approach in that setting.

At the other end of the spectrum are vertical contracts with ordinary employees. For them, employment is largely a take-it-or-leave-it proposition. They may bargain around the edges over compensation or title, but the business is not going to change its standard documents. In theory, the employee can decide not to take the job, but when many businesses offer employment on similar terms, not taking the job equates to not getting a job. For most workers and their families, that is not a viable alternative. In those settings, the terms of an employment-related agreement operate as a contract of adhesion, warranting a skeptical judicial attitude towards choice of law, choice of forum, and restrictive covenants.

In between the top business executive and the line employee fall the most difficult cases: workers who are more than just line employees but who do not occupy the rarefied air of the C-suite. The employees receiving covenant-laden equity grants

range from the manager of an individual site in a multiple-site operation to lower- and mid-tier executives. They hold important roles in the organization, receive meaningful compensation, and yet still participate on a take-it-or-leave-it basis.[101]

*Parks* fell into the band that most favored the application of Delaware law, deference to a Delaware forum provision, and the enforcement of restrictive covenants. This case falls into the most difficult band.

Fundamentally, this is a case about employment. For employment-related matters, Holdco cannot rely on Delaware law to override the employment statutes of the other forty-nine states. The goal of uniform treatment through Delaware law flies in the face of the *Restatement* factors as applied to employment disputes. Delaware's only interest in employment cases is "a general interest" in promoting freedom of contract.[102] That interest arises because Holdco is a Delaware citizen engaging in contracting, but the *Restatement* regards that factor as weak.[103] The exception proves the rule: When a dispute concerns internal affairs, the interests of the state of incorporation become paramount.[104] For internal affairs matters, Delaware law will

---

[101] I once worked with employees in the latter category who jokingly referred to themselves as the "scum de la crème." That gibe captures the plight of those important enough for a corporation to care about constraining but not important enough to have the leverage to push back.

[102] *Ascension Ins. Hldgs., LLC v. Underwood*, 2015 WL 356002, at *5 (Del. Ch. Jan. 28, 2015).

[103] *See Restatement*, *supra*, § 188 cmt. e.

[104] *See Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982) ("The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to

apply, the Delaware Forum Clause will govern, and the Partnership Agreement will receive uniform treatment. But the internal affairs doctrine does not extend to a Delaware entity's relationships with its employees.

This is not a case in which the drafters of the Unit Agreement are addressing a quintessentially internal dimension of an entity's affairs. The drafters of the Unit Agreement are attempting to use Delaware law to govern the relationship between Holdco and a Bluepeak employee who lives and works in Oklahoma. Oklahoma has a more significant interest in regulating that relationship.

Contrary to Holdco's argument, the Unit Agreement acknowledges that reality and anticipates non-uniform enforcement. A pro-blue-penciling provision states:

> If it is determined by a court of competent jurisdiction in any state or other jurisdiction that any restriction in this Section 6 [*i.e.*, the Covenants] is excessive in duration of scope or is unreasonable or unenforceable under the laws of that state or other jurisdiction, it is the intention of the parties that such restriction may be modified or amended by the court to render it enforceable to the maximum extent permitted by the law of that state.[105]

That provision recognizes that the laws of states other than Delaware likely will govern the Covenants and restrict their scope, resulting in non-unform enforcement.

---

the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands.") (citing *Restatement*, *supra*, § 302 cmt. b.); *Salzberg*, 227 A.3d at 126–29 (discussing Delaware's overriding interest in the administration of its law governing internal affairs); *VantagePoint Venture P'rs 1996 v. Examen, Inc.*, 871 A.2d 1108, 1113 (Del. 2005) ("The internal affairs doctrine applies to those matters that pertain to the relationships among or between the corporation and its officers, directors, and shareholders.").

[105] UA § 6.2.

A severability provision in the Unit Agreement reflects the same expectation of non-uniform treatment. It states:

> If any provision of this Agreement is, becomes or is deemed to be invalid, illegal or unenforceable in any jurisdiction or as to any Person or award, such provision shall be constructed [sic] or deemed amended to conform to all applicable laws, or if it cannot be construed or deemed amended without, in the determination of the General Partner, materially altering the intent of this Agreement or the award, such provision shall be stricken as to such jurisdiction, Person or award and the remainder of this Agreement and any such award shall remain in full force and effect.[106]

The severability provision specifically requests non-uniform enforcement "as to such jurisdiction, Person or award."

For purposes of the Delaware Law Provision, the Delaware Forum Clause, the Covenants, and employment-related issues generally, Delaware does not have the predominant interest. If anything, Delaware has an interest in *not* asserting jurisdiction over Stoops for purposes of adjudicating an employment dispute under the Covenants. Doing so would be dangerous precisely because it would deploy the Delaware Law Provision and the Delaware Forum Clause to override how another jurisdiction regulates matters carrying profound importance for that jurisdiction. If Delaware courts do not defer to how other states address issues of great importance to them, then states in other courts may prove reluctant to defer to Delaware on issues of importance to our state.[107]

---

[106] UA § 7.13.

[107] *See Diedenhofen-Lennartz v. Diedenhofen*, 931 A.2d 439, 451–52 (Del. Ch. 2007) ("If we expect that other sovereigns will respect our state's overriding interest in the interpretation and enforcement of our entity laws, we must show reciprocal

Delaware also has an interest in *not* asserting jurisdiction over Stoops for purposes of this case because of the burdens that employment disputes impose on this court. Private-equity-backed businesses have embraced the legal technology of building restrictive covenants into equity grants. With the proliferation of those businesses, applications in this court to enforce restrictive covenants have proliferated.[108] The combination of provisions like the Delaware Forum Clause,

respect."); *see also Gurney-Goldman v. Goldman*, 321 A.3d 559, 588 (Del. Ch. 2024) ("With ever increasing frequency, practitioners argue that Delaware entity law should take precedence over areas of law that carry significance for other jurisdictions."), *aff'd,* — A.3d —, 2026 WL 237221 (Del. Jan. 29, 2026); *Sunder Energy, LLC v. Jackson*, 305 A.3d 723, 730 (Del. Ch. 2023) ("But Sunder filed suit here—in Delaware—because Sunder is a Delaware LLC and its lawyers deployed the now widespread legal technology of inserting restrictive covenants into an internal governance document. Businesses and their lawyers do that so they can invoke Delaware's contractarian regime and argue that it should override how other jurisdictions regulate restrictive covenants." (footnotes omitted)), *aff'd in part, rev'd in part on other grounds,* 332 A.3d 472 (Del. 2024); *Holsopple*, 241 A.3d at 804 n.4 ("Delaware court[s] have confronted with increasing frequency situations in which parties have attempted to use choice-of-law provisions selecting Delaware law to bypass the substantive law of sister states. In this court, the conflicts most often involve agreements containing restrictive covenants." (collecting authorities)). *See generally* Ann M. Lipton, *Inside Out (or, One State to Rule Them All): New Challenges to the Internal Affairs Doctrine*, 58 Wake Forest L. Rev. 321, 323–24 (2023) ("The current scope of the internal affairs doctrine undermines states' ability to regulate economic activity within their territory, as laws enacted to protect their residents and promote state policies are evaded by entity founders who choose to organize in Delaware despite maintaining all substantive operations in other locations. More importantly, citizens who reside in the affected states—those outside of Delaware— have no voice in policy choices that may directly affect their lives. And it appears that states all too often acquiesce in this arrangement, perhaps because it allows them to evade responsibility for difficult political choices.").

[108] *See Fairstead Cap. Mgmt. LLC v. Blodgett*, — A.3d —, —, 2026 WL 1327565, at *14 (Del. Ch. May 13, 2026) (discussing twenty-five decisions issued between 2021 and 2026: "In the past five years alone, the Court of Chancery has issued written decisions addressing disputes over restrictive covenants for companies operating in Hong Kong, Italy, Alabama, California, Florida, Idaho, Illinois, Louisiana, New York,

Delaware Law Provision, and the Covenants calls on the Delaware courts to adjudicate post-employment disputes for the country and potentially the world. That is a burden that this court will never have sufficient resources to bear.

For present purposes, it is enough that Oklahoma's specific interests in having its law govern the Covenants and having its courts available to hear this dispute override Delaware's general interest in freedom of contract. Oklahoma law overrides the Delaware Forum Provision and the Oklahoma Access Statute overrides the Delaware Forum Clause for purposes of this employment-related action.

### 2. No Personal Jurisdiction

Without the ability to rely on the Delaware Forum Clause, this court ordinarily would analyze whether Stoops is otherwise subject to personal jurisdiction here. The parties agree that the court cannot exercise personal jurisdiction over Stoops without the clause. Personal jurisdiction is therefore lacking.

### B. Non-Enforcement Under Delaware Law

Assuming Delaware law applies, a compelling combination of considerations

---

Oklahoma, Pennsylvania, South Caronia, Texas, Utah, Washington, and Wisconsin. That list excludes orders and transcript rulings. It also excludes decisions addressing restrictive covenants related to sales of businesses." (footnotes omitted)); *id.* at *14 n.116 ("A search for non-compete! non-solicit! and "restrictive covenant" limited to Court of Chancery cases between 2021 and 2026 generates 180 results."); *Sunder Energy*, 305 A.3d at 730 (discussing twenty-seven decisions issued between 2018 and 2023; "In the past five years alone, the Court of Chancery has issued written decisions addressing disputes over restrictive covenants for businesses operating in Hong Kong, Italy, Alabama, Arizona, California, Colorado, Idaho, Illinois, Louisiana, Nebraska, New Jersey, New York, Oklahoma, and Texas. Only two businesses operated in Delaware, one of which filed two cases. That list excludes transcript rulings." (footnotes omitted)).

calls for not enforcing the Delaware Forum Clause against Stoops. Without the hook of the Delaware Forum Clause, the court again lacks personal jurisdiction over him.

1.  **The Law Governing The Enforcement Of Forum Selection Clauses**

Before 1972, most jurisdictions treated forum selection clauses as *per se* unenforceable.[109] That changed when the Supreme Court of the United States overturned more than a century of precedent in *Bremen* and held that forum selection clauses were presumptively valid and enforceable.[110] That decision recognized two exceptions to the rule of presumptive enforceability. First, an otherwise contractually valid forum selection clause should not be enforced if contrary to public policy.[111] Second, an otherwise contractually valid forum selection clause should not be enforced if it is unreasonable.[112]

---

[109] John F. Coyle, *"Contractually Valid" Forum Selection Clauses*, 108 Iowa L. Rev. 127, 142 (2022).

[110] *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 9–12, 18–20 (1972).

[111] *Id.* at 15 ("A contractual choice-of-forum clause should be held unenforceable if enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision.").

[112] *Id.* at 16–17 ("Courts have also suggested that a forum clause, even though it is freely bargained for and contravenes no important public policy of the forum, may nevertheless be 'unreasonable' and unenforceable if the chosen forum is seriously inconvenient for the trial of the action. Of course, where it can be said with reasonable assurance that at the time they entered the contract, the parties to a freely negotiated private international commercial agreement contemplated the claimed inconvenience, it is difficult to see why any such claim of inconvenience should be heard to render the forum clause unenforceable. We are not here dealing with an agreement between two Americans to resolve their essentially local disputes in a remote alien forum. In such a case, the serious inconvenience of the contractual forum to one or both of the parties might carry greater weight in determining the

*Bremen* involved a forum selection clause in a negotiated agreement between two sophisticated parties. Nineteen years later, in *Carnival Cruise*, the Supreme Court of the United States applied *Bremen* to a forum selection clause in a form contract with a consumer.[113] A cruise line included a forum selection clause on the back of a pre-printed passenger ticket that required all lawsuits against the cruise line to proceed in Florida. The justices found the clause reasonable, noting that the cruise line "has its principal place of business in Florida, and many of its cruises depart from and return to Florida ports."[114] The justices also noted that the passengers had ample notice of the provision and "presumably retained the option of rejecting the contract with impunity."[115] The Court expressly declined to address the

---

reasonableness of the forum clause. The remoteness of the forum might suggest that the agreement was an adhesive one, or that the parties did not have the particular controversy in mind when they made their agreement; yet even there the party claiming should bear a heavy burden of proof.").

[113] *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585 (1991). It was *Carnival Cruise* rather than *Bremen* that revolutionized forum selection law. As one scholar has noted, *Carnival Cruise* enforced a forum selection clause "that would have been void as adhesive even under the laws of nations with a long history of favor towards such agreements." Patrick J. Borchers, *Forum Selection Agreements in the Federal Courts After* Carnival Cruise: *A Proposal for Congressional Reform*, 67 Wash. L. Rev. 55, 59 (1992).

[114] *Carnival Cruise*, 499 U.S. at 595. One scholar has described this reasoning as "weak, arbitrary, and result-oriented." Edward A. Purcell, Jr., *Geography as a Litigation Weapon: Consumers, Forum selection Clauses, and the Rehnquist Court*, 40 UCLA L. Rev. 423, 425 (1992).

[115] *Carnival Cruise*, 499 U.S. at 595.

question of insufficient notice.[116] The Court nevertheless stressed that a forum selection clause in a form agreement remains "subject to judicial scrutiny for fundamental fairness."[117] That rule recognizes that including a forum selection clause in a take-it-or-leave-it agreement represents a form of forum shopping, and that form of forum shopping can be just as pernicious as other forms.[118]

---

[116] *Id.* at 590 ("[W]e do not address the question whether respondents had sufficient notice of the forum clause before entering the contract for passage. Respondents essentially have conceded that they had notice of the forum selection provision."); *see id.* (noting the passenger conceded that notice of the forum selection clause had been "reasonably communicated"). Writing in dissent and joined by Justice Marshall, Justice Stevens would have held that the pre-printed form did not give notice of the clause in any meaningful way. He also would not have enforced the clause because it appeared in a contract of adhesion that the passengers did not receive until after they had paid their money. *Id.* at 597–601 (Stevens, J., dissenting); *see also* Borchers, *supra*, at 77 ("The final troubling aspect of the Court's opinion was its eagerness to hang the Shutes on their brief. Although the Court concluded that the Shutes conceded the issue of notice in their brief, this was not the same thing as conceding assent. In fact, the Shutes brief, only two pages later, hit on the crucial matter by arguing that 'the ticket contract also seems to prevent a refund for an unused ticket, thereby removing the passengers . . . right to seek a refund if the clause were offensive.' Under the circumstances, therefore, the Court's conclusion that the Shutes' waived the issue of whether the clause was part of the contract—perhaps the most fundamental issue in the case—seems unjust." (footnotes omitted)).

[117] *Carnival Cruise*, 499 U.S. at 595.

[118] *See* Linda S. Mullenix, *Gaming the System: Protecting Consumers from Unconscionable Contractual Forum selection and Arbitration Clauses*, 66 Hastings L.J. 719, 737–42 (2015); *see id.* at 742–43 ("As we have seen, federal courts eschew various litigant tactics intended to game the system, with forum shopping and creative manipulation of federal jurisdiction at the top of this list followed closely by gambits to secure preferable law. A reframing of the problem of forum selection clauses (as well as choice-of-law provisions and arbitration clauses) is through the lens of litigation gamesmanship, rather than contract law . . . . A not insignificant problem with forum selection clause jurisprudence, which opens the door to such gamesmanship, is that it embraces a complicated tangle of principles that vary according to different contexts. This tangle works to the advantage of prospective corporate defendants who, knowledgeable of these principles and their consequences,

The Delaware Supreme Court has adopted the principles set out in *Bremen*

---

exploit forum selection and choice-of-law clauses to their advantage."). In other words, while forum shopping traditionally focuses on the plaintiff's decision to file suit, the party who includes a forum selection clause in take-it-or-leave-it contract of adhesion engages in forum shopping in advance. *Holsopple*, 250 A.3d at 975 ("[I]n an effort to avoid California law and evade the California courts, Focus Sub included various employment-related provisions in its standard-form Unit Agreements, attempted to insulate those provisions from challenge using the Delaware-Law Provisions, and sought to shift any disputes to Delaware through the Delaware-Forum Provisions . . . . Through this process, Focus Parent and Focus Sub engaged in forum shopping. They did so prospectively by including provisions in a standard-form agreement, instead of reactively by rushing to court after a dispute arose. But they engaged in forum shopping nonetheless.").

"Delaware courts have long discouraged forum shopping." *Kurtin v. KRE, LLC*, 2005 WL 1200188, at *7 (Del. Ch. May 16, 2005). The policy considerations implicated by forum selection clauses in take-it-or-leave-it agreements resemble the policy considerations applicable to a plaintiff who files a declaratory judgment to secure a favorable forum: In both instances, a party seeks to preempt the natural choice of forum. Delaware takes a "dim view of declaratory judgment claims of non-breach made for the purposes of forum shopping." *In re Delta & Pine Land Co. S'holders Litig.*, 2000 WL 1010584, at *5 (Del. Ch. July 17, 2000); *see Lincoln Benefit Life Co. v. Wilmington Tr., N.A.*, 2019 WL 1307870, at *3 (Del. Super. Mar. 21, 2019) (noting that "a first-filed declaratory judgment action brought in an anticipatory nature is not entitled to the deference generally afforded to a plaintiff's choice of forum"); *E-Birchtree, LLC v. Enter. Prods. Operating, L.P.*, 2007 WL 914644, at *3 (Del. Super. 2007) (same); *cf. In re Peierls Fam. Inter Vivos Trusts*, 59 A.3d 471, 490 (Del. Ch. 2012) (declining to "accept jurisdiction" over trusts where it would put the court in "an ill-defined, ongoing role that could be used for forum shopping"), *aff'd*, 77 A.3d 249 (Del. 2013). Delaware courts should take at least a similarly dim view of efforts to use the internal affairs doctrine and Delaware forum selection clauses to channel non-Delaware employment disputes under take-it-or-leave-it agreements into Delaware courts. *See Holsopple*, 250 A.3d at 975 ("The effort by Focus Parent and Focus Sub to engage in forum shopping by forcing a California resident to litigate in Delaware is a factor that counsels in favor of dismissal."); *see also Aveta, Inc. v. Colon*, 942 A.2d 603, 610 (Del. Ch. 2008) (declining to enforce forum selection clause and dismissing case where "the enforceability of the non-competition agreement will be evaluated under Puerto Rico's—not Delaware's law" among other factors favoring dismissal). Using a Delaware forum and Delaware choice of law provision to drive non-Delaware employment disputes under take-it-or-leave-it agreements into Delaware courts is arguably worse, at least where, as here, the defendant would not otherwise be subject to suit in Delaware.

45

and *Carnival Cruise.*[119] Forum selection clauses under Delaware law are therefore presumptively valid and enforceable.[120] But a court can decline to enforce a forum selection clause when "its application would be unreasonable."[121] "Review under *Bremen* and its progeny is genuine, not toothless. Indeed, the *Bremen* doctrine exists precisely to ensure that facially valid forum selection clauses are not used in an unreasonable manner in particular circumstances."[122] "Courts should assess the reasonableness of a forum selection clause on a case-by-case basis."[123]

Choice of law and choice of forum are closely connected.[124] "Venue is often a vitally important matter, as is shown by the frequency with which parties contractually provide for and litigate the issue. Suit might well not be pursued, or might not be as successful, in a significantly less convenient forum . . . ."[125] "Forum selection provisions especially are legitimate and even favored items for bargaining.

---

[119] *Salzberg*, 227 A.3d at 132.

[120] *Boilermakers Loc. 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 957 (Del. Ch. 2013).

[121] *Id.* at 958.

[122] *Id.* at 958–59 (footnotes omitted); *accord Mack v. Rev Worldwide, Inc.*, 2020 WL 7774604, at *9 (Del. Ch. Dec. 30, 2020) ("[A] plaintiff may still avoid the forum selection bylaw by demonstrating that its enforcement is unreasonable because it would be inequitable to require the parties to litigate in the chosen forum.").

[123] *Ingres Corp. v. CA, Inc.*, 8 A.3d 1143, 1146 (Del. 2010).

[124] Reichard, *supra*, at 878 ("choice of forum is often discussed in conjunction with choice of law").

[125] *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 39 (1988) (Scalia, J., dissenting).

However, even the legitimate structuring of those contract rights have an outer limit set by concepts of due process and principles of choice of law."[126]

## 2. Enforcement In This Case Is Unreasonable.

In this case, enforcing the Delaware Forum Clause would be unreasonable. It would force Stoops to defend himself in Delaware on issues related to his employment in Oklahoma despite having had no notice of the Delaware Forum Clause before this lawsuit.

Delaware courts regularly enforce forum selection clauses when the parties have "consented freely and knowingly to the court's exercise of jurisdiction."[127] "The legal effect of a forum selection clause depends in the first instance upon whether its

---

[126] *Econ. Steel Bldg. Techs.*, 2020 WL 1866869, at *2.

[127] *Carlyle*, 67 A.3d at 381; *accord Hornberger Mgmt. Co. v. Haws & Tingle Gen. Contractors, Inc.*, 768 A.2d 983, 987 (Del. Super. 2000) ("Forum selection clauses are prima facie valid and do not violate due process if they are the product of a freely negotiated agreement and are not unreasonable and unjust." (internal quotations and footnotes omitted)); *see Leaf Fin. Corp. v. ACS Servs., Inc.*, 2010 WL 3447729, at *4 (Del. Super. Aug. 31, 2010) (enforcing forum selection clause "when the parties freely agreed that litigation should be conducted in that forum"); *HealthTrio, Inc. v. Margules*, 2007 WL 544156, at *3 (Del. Super. Jan. 16, 2007) (same); *LHO New Orleans LM, L.P. v. MHI Leasco New Orleans, Inc.*, 2006 WL 1134723, at *3 (Del. Super. Apr. 11, 2006) (same); *Simm Assocs., Inc. v. PMC Nat'l Bank*, 1998 WL 961764, at *3 (Del. Super. Oct. 8, 1998) (same); *Elia Corp. v. Paul N. Howard Co.*, 391 A.2d 214, 216 (Del. Super. 1978) (noting forum selection cause should be enforced "when the parties have freely agreed that litigation shall be conducted in another forum and where such agreement is not unreasonable at the time of litigation."); *see generally Burger King*, 471 U.S. at 472 n.14 ("Where such forum selection provisions have been obtained through freely negotiated agreements and are not unreasonable and unjust, their enforcement does not offend due process." (cleaned up)), *cited with approval in Genuine Parts*, 137 A.3d at 148 n.126.

existence was reasonably communicated to the plaintiff."[128] Blackletter sources[129]

and decisions from other jurisdictions[130] make clear that when the clause appears in

[128] *Effron v. Sun Line Cruises, Inc.*, 67 F.3d 7, 9 (2d Cir. 1995); *accord Phillips v. Audio Active Ltd.*, 494 F.3d 378, 383 (2d Cir. 2007); *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006); *Testa v. Becker*, 2010 WL 1644883, at *5 (C.D. Cal. Apr. 22, 2010); *Mezyk v. U.S. Bank Pension Plan*, 2009 WL 3853878, at *3 (S.D. Ill. Nov. 18, 2009); *O'Brien v. Okemo Mountain, Inc.*, 17 F. Supp. 2d 98, 103 (D. Conn. 1998).

[129] *See* 11 Richard A. Lord, Williston on Contracts § 30:25 (4th ed. 2023), Westlaw (database updated May 2026) ("it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms"); 17A C.J.S. Contracts § 419, Westlaw (database updated Apr. 2026) ("the terms of the incorporated document must be known or easily available to the parties"); Restatement (Second) of Contracts § 132 cmt. c (A.L.I. 1981), Westlaw (database updated Oct. 2024) (explaining that "signed and unsigned writings together may constitute a memorandum" where the signed writing "refers to the unsigned writing explicitly or by implication, or that the party to be charged physically attaches one document to the other or encloses them in the same envelope").

[130] *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996) (requiring parties to have had knowledge of and assented to the incorporated terms and requiring that the incorporated document be referenced and described sufficiently so that it may be identified beyond all reasonable doubt); *Lamb v. Emhart Corp.*, 47 F.3d 551, 558 (2d Cir. 1995) ("In order to uphold the validity of terms incorporated by reference it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms."); *Hertz Corp. v. Zurich Am. Ins. Co.*, 496 F. Supp. 2d 668, 675 (E.D. Va. 2007) (recognizing that "it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms" and stating that the identity of the secondary document must be readily ascertainable); *Walker v. Builddirect.Com Techs. Inc.*, 349 P.3d 549, 551 (Okla. 2015) (stating that an agreement may incorporate an extrinsic document or agreement by reference only when "the identity and location of the extrinsic document may be ascertained beyond doubt"); *Ingersoll-Rand Co. v. El Dorado Chem. Co.*, 283 S.W.3d 191, 196 (Ark. 2008) (explaining that the incorporated document must be "known or easily available to the contracting parties"); *W. Washington Corp. of Seventh-Day Adventists v. Ferrellgas, Inc.*, 7 P.3d 861, 865 (Wash. 2000) ("It must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms."); *Hous. Auth. of Hartford v. McKenzie*, 412 A.2d 1143, 1145 (Conn. 1979) ("The critical concern in determining the validity of the terms of a document incorporated by reference is whether the contracting parties knew of and assented to the additional provisions. The meeting of

a document or agreement incorporated by reference, the party against whom the clause would be enforced must know of and assent to the incorporated terms, either by receiving them or because their identity and location can be ascertained beyond doubt. Applying that principle, decisions have refused to enforce forum selection provisions that appeared in an incorporated document that was not provided or readily available.[131]

In *UBEO*, Chancellor McCormick reached a similar result.[132] UBEO Holdings, LLC acquired a California-based company by merger. The merger agreement bound the sell-side signatories to restrictive covenants lasting five years. It also contained an exclusive Delaware forum selection clause.[133]

---

the minds and mutuality of assent are the most basic ingredients of a contract. Hence, the court, while willing to enforce the incorporated terms, will do so only when the whole writing and the circumstances surrounding its making evidence the parties' knowledge of and assent to each term."); *Kleveland v. Chicago Title*, 46 Cal. Rptr. 3d 314, 316 (Cal. Ct. App. 2d 2006) (permitting incorporation by reference where "the terms of the incorporated documents were known or easily available to the contracting parties'); *Consol. Realty Grp. v. Sizzling Platter, Inc.*, 930 P.2d 268, 273 (Utah Ct. App. 1996) (same); *see Bass v. Tour 18 at Rose Creek, LP*, 795 F. App'x 613, 620 (10th Cir. 2020) (holding that membership agreement did not "adequately specify the location of the 'club rules'" and therefore failed to validly incorporate them by reference).

[131] *E.g., Remedial Constr. Servs., LP v. AECOM, Inc.*, 279 Cal. Rptr. 3d 909, 913 (Cal. Ct. App. 2021); *Alpert, Goldberg, Butler, Norton & Weiss, P.C. v. Quinn*, 983 A.2d 604, 619 (N.J. Super. Ct. App. Div. 2009); *Henderson v. Law. Title Ins. Corp.*, 843 N.E.2d 152, 160 (Ohio 2006); *Walker*, 349 P.3d at 554; *see also Specht v. Netscape Communications Corp.*, 306 F.3d 17, 31–32 (2d Cir. 2002); *Jerez v. JD Closeouts, LLC*, 943 N.Y.S.2d 392, 396 (N.Y. Sup. Ct. 2012).

[132] *UBEO Holdings, LLC v. Drakulic*, 2021 WL 1716966 (Del. Ch. Apr. 30, 2021).

[133] *Id.* at *1.

Michael Drakulic was a mid-level manager who lived and worked in California for the seller. He received a small grant of equity as compensation. After the sell-side principals had agreed to the deal, they gave Drakulic a signature page to sign. He never received or saw the merger agreement, but he signed and returned the signature page anyway.

Several years after the merger closed, Drakulic resigned to work for a competitor. UBEO sued him in Delaware to enforce the restrictive covenants in the merger agreement. When Drakulic disputed the court's ability to exercise personal jurisdiction over him, UBEO relied on the forum selection clause in the merger agreement. But Drakulic "never saw or read the [merger] agreement itself and was never made aware of the forum selection provision."[134] The first time he received a complete copy of the merger agreement or learned about the forum selection clause was when UBEO sued him.[135] Chancellor McCormick declined to enforce the forum selection clause, finding that doing so would be "unjust."[136]

As Holdco points out, the Chancellor issued *UBEO* as a letter decision, believing that her decision "carries little precedential value and speaks only to issues relevant to the parties."[137] Perhaps she did not expect other parties to repeat the trick of not providing an employee with access to the contract containing the forum

---

[134] *Id.*

[135] Id. at *7, 12.

[136] *Id.* at *12.

[137] *Id.* at *1.

selection provision the employer sought to enforce. Yet that is what Holdco has done here. In any event, *UBEO* comports with basic principles of contract law. That letter opinion does not need to carry precedential weight when ample other authorities stand for the proposition that a party cannot enforce a secret forum selection clause.

The Unit Agreement is also a contract of adhesion.[138] There is nothing wrong with contracts of adhesion *per se*; they are simply standardized and non-negotiable contracts (or at least almost entirely non-negotiable contracts).[139]

> Standardization of agreements serves many of the same functions as standardization of goods and services; both are essential to a system of mass production and distribution. Scarce and costly time and skill can be devoted to a class of transactions rather than to details of individual transactions. Legal rules which would apply in the absence of agreement can be shaped to fit the particular type of transaction, and extra copies of the form can be used for purposes such as record-keeping, coordination and supervision . . . . Operations are simplified and costs reduced, to the advantage of all concerned.[140]

But standardized agreements also carry a heightened risk of unfair terms. Repeat players draft them to protect their interests, and although a recipient may be able to negotiate over a few variable terms, the contract as a whole is presented on a take-it-

---

[138] *See Worldwide Ins. Gp. v. Klopp*, 603 A.2d 788, 790 (Del. 1992); *Graham v. State Farm Mut. Auto. Inc. Co.*, 565 A.2d 908, 912 (Del. 1989).

[139] *See* Restatement (Second) of Contracts, *supra*, § 211, cmt. b (explaining that "[o]ne of the purposes of standardization is to eliminate bargaining over details of individual transactions" and that "[e]mployees regularly using a form often have only a limited understanding of its terms and limited authority to vary them . . . . But they understand that they are assenting to the terms not read or not understood, subject to such limitations as the law may impose.").

[140] *Id.* cmt. a.

or-leave-it basis.[141] That dynamic creates an "obvious danger of overreaching."[142] The *Restatement (Second) of Contracts* therefore counsels against enforcing terms that are unknown or unreasonable, particularly where "the adhering party never had an opportunity to read the term, or if it is illegible or otherwise hidden from view."[143]

The danger of overreaching extends to forum selection clauses.[144] *Carnival*

---

[141] *Id.* cmt. c. (noting that "[s]tandardized agreements are commonly prepared by one party . . . and the draftsman may be tempted to overdraw in the interest of his employer"); *see* Purcell, *supra*, at 492–93 ("[I]ndustries can be competitive in some ways, such as pricing or puffing, but not in others. Because some contractual provisions may serve to enhance the profitability of all competing firms and nevertheless remain beyond the understanding of consumers, those provisions would tend to become uniform throughout an industry. In such a case, consumers would find themselves at the same contractual disadvantage regardless of which of the industry's competitors they chose to deal with and regardless of whether the industry was, in some other respect, competitive. Forum selection clauses seem, quite understandably, to be just such a provision." (footnote omitted)); *see also* David A. Hoffman, *Defeating the Empire of the Forms*, 109 Va. L. Rev. 1367, 1382–85 (2023) (describing the rise of standardized written employment agreements and litigation-shaping boilerplate in those agreements; noting that by 2020, "65% of workers at companies with more than 1,000 employees" were subject to mandatory arbitration, up from 2% in 1992, and that, in the last five years, there has been a sharp increase in arbitration filings by employees at large companies).

[142] Restatement (Second) of Contracts § 211, cmt. c.

[143] *Id.* cmt. f (explaining that this policy is "closely related to the policy against unconscionable terms and the rule of interpretation against the draftsman [in] §§ 206 and 208" of the Restatement).

[144] *See Holsopple*, 250 A.3d at 975 n.21 ("A key factor is the standard-form nature of the Unit Agreements. Unlike in *Abry Partners*, the paradigmatic case for deference to choice-of-law and choice-of-forum-provisions, the parties in this case did not negotiate freely before agreeing on Delaware law and a Delaware forum. Focus Parent and Focus Sub designed the package of legal rights reflected in the Unit Agreement, presented them in a standard-form agreement, and then conditioned Holsopple's receipt of a substantial portion of his compensation on accepting those terms."); *see also Genuine Parts*, 137 A.3d at 148 ("[A] party to a non-adhesion contract can subject itself to personal jurisdiction via a forum selection clause.").

*Cruise* demonstrates that a contract of adhesion can contain an enforceable forum selection clause so long as (1) the recipient has notice of the forum selection provision, (2) the chosen forum makes sense in light of the issues to be litigated, and (3) the recipient "retain[s] the option of rejecting the contract with impunity."[145] This case goes zero for three.

For starters, the Unit Agreement was a classic contract of adhesion. Holdco's counsel drafted it to protect Holdco's interests. Bluepeak presented the Unit Agreement on a take-it-or-leave-it basis. Stoops could—and did—negotiate over the number of Incentive Units he received, but he had no ability to change their terms.

Under the first *Carnival Cruise* factor, the recipient of the take-it-or-leave-it agreement must have notice of the forum selection provision. Notice is essential because the *Carnival Cruise* doctrine rests on the premise that the party accepting the provision "willingly agrees, in advance of any dispute, to waive its choice of forum (or choice of law, or access to the adjudicative system)" such that the accepting party "knowingly and willingly waives its 'venue privilege.'"[146]

Stoops did not freely and knowingly consent to the Delaware Forum Clause. The Unit Agreement did not contain it. Although the Unit Agreement incorporated the Partnership Agreement by reference, Bluepeak did not provide Stoops with a copy, describe its contents, tell him where he could find it, or commit to making it

---

[145] *Carnival Cruise*, 499 U.S. at 595.

[146] Mullenix, *supra*, at 756 (footnotes omitted).

available on request. In fact, GI Partners treated the Partnership Agreement as confidential, and no one outside of Bluepeak's C-suite ever saw it.[147]

Under the second *Carnival Cruise* factor, the chosen forum makes little sense as a place to litigate employment-related issues. Stoops lived and worked in Oklahoma. The logical forums for disputes over the Covenants are the Oklahoma courts or arbitration. Delaware would be a logical forum for litigating internal affairs disputes, but not an external, employment-related dispute. There was no reason for Stoops to think that a secret Delaware forum selection clause would govern the Covenants.

Under the third *Carnival Cruise* factor, the recipient must "retain the option of rejecting the contract with impunity."[148] Stoops did not have that option. By the time he saw the Unit Agreement, Stoops' only choices were to sign or forfeit the equity award that convinced him to join Bluepeak. He had resigned from his former employer and started working at Bluepeak six weeks before.

Holdco argues that a party cannot escape the implications of a contract that party has signed by not reading the agreement and claiming to be unaware of its

---

[147] The employment agreements that the C-suite executives negotiated offer significant insight into how employees with actual bargaining power responded to the Delaware Forum Clause, Delaware Law Provision, and Covenants. At least one C-suite executive—the CEO—did not accept those terms, bargaining instead for a different forum, different law, and different covenants. *See, e.g.*, Ex. 46 §§ 9, 12(i). His insistence on different terms suggests that the Delaware Forum Clause, Delaware Law Provision, and Covenants are unfair.

[148] *Carnival Cruise*, 499 U.S. at 595.

terms. True. But not receiving or being able to access a document differs in kind from not reading a document that the recipient has received or can access.[149]

Holdco also relies on *Graham*.[150] There, a married couple applied for an insurance policy, were approved, and paid the initial premium. Weeks later, they received the policy, which contained an arbitration provision. After they suffered a loss, they sued the insurer in state court. When the insurer moved to compel arbitration, the couple objected, claiming they never agreed to arbitration and that the insurer could not impose arbitration unilaterally. The Delaware Superior Court found that the couple waived any objection to arbitration by accepting the policy and benefiting from coverage for two years before the loss.[151]

On appeal, the couple renewed their challenges, adding that the insurance policy was a contract of adhesion and therefore could not support a fully informed waiver.[152] The Delaware Supreme Court agreed that the policy was a contract of

---

[149] *See* Tess Wilkinson-Ryan, *A Psychological Account of Consent to Fine Print*, 99 Iowa L. Rev. 1745, 1754–55 (2014) (explaining that failure to read a contract's terms will not bar its enforcement, but if "a contract term is 'hidden,' a court may refuse to enforce it . . . . Parties are deemed to consent to terms they have reason to know exist, but firms must give parties reason to know of the terms. In general, . . . courts will enforce hidden terms as long as the party has some means to exit the contract when the term is revealed, even if doing so is burdensome and unlikely" (footnotes omitted)).

[150] 565 A.2d 908.

[151] *Id.* at 909–10.

[152] *Id.* at 912.

adhesion, but rejected the couple's arguments nevertheless.[153] The justices reasoned that the couple could not accept the portions of the policy they liked while rejecting the arbitration provision they disliked. The justices also opined that the arbitration provision was fairly structured, and they noted that Delaware public policy supported arbitration.[154]

In reaching these conclusions, the Delaware Supreme Court also reasoned that the couple had not been bound irrevocably to the policy, even after securing coverage.

> It is doubtless true that any attempt to remove the arbitration clause after coverage had begun would have been futile. An attempt to bargain over inclusion of the clause before coverage began would have been equally unavailing. However, if the Grahams had read their policy after receiving it, they would have discovered the arbitration clause. If they then believed this clause to be sufficiently objectionable, they could have cancelled the policy and sought coverage with another insurer on more agreeable terms. Nevertheless, the Grahams continued to accept coverage and pay premiums for two years before their accident occurred. A party to a contract cannot silently accept its benefits and then object to its perceived disadvantages, nor can a party's failure to read a contract justify its avoidance.[155]

Given the couple's ability to cancel the policy and secure coverage elsewhere, the insurer's failure to disclose a fairly designed mandatory arbitration provision was not unconscionable.

---

[153] *Id.*

[154] *Id.* at 910–11.

[155] *Id.* at 913.

By reasoning along those lines, the Delaware Supreme Court echoed *Carnival Cruise*.[156] But as discussed previously, Stoops did not have the option of cancelling the Unit Agreement and returning to the status quo. He had left his prior employment weeks before, and once he signed, he was bound.

Taking these factors together, it would be unreasonable to enforce the Delaware Forum Clause against Stoops. Even if Delaware law applies, the Delaware Forum Clause cannot support the exercise of personal jurisdiction.

## IV. OTHER HURDLES TO INJUNCTIVE RELIEF

Assuming for purposes of analysis that Holdco had established a reasonable likelihood that the court could exercise personal jurisdiction over Stoops, its application for a preliminary injunction would have still more hurdles to clear. Because Holdco's application fails for want of personal jurisdiction, this decision need not reach them.

## V. CONCLUSION

Holdco's application for a preliminary injunction is denied. Stoops has moved separately to dismiss this action for want of personal jurisdiction. The court will grant that motion, bringing this case to a close. The dismissal does not mean Holdco cannot proceed with its claims. Holdco simply must do so under Oklahoma law and in a jurisdiction like Oklahoma where a court can exercise jurisdiction over Stoops.

---

[156] *Carnival Cruise*, 499 U.S. at 595 (enforcing an arbitration provision, in part, because the passenger "presumably retained the option of rejecting the contract with impunity.").